IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **Louise Hicks** | § | |
| | § | |
| Plaintiff, | § | |
| | § | C. A. No. |
| v. | § | |
| | § | |
| **TeleTech Service Corporation** | § | |
| | § | |
| | § | |
| | § | **(Jury Demanded)** |
| Defendant | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

**TO THE HONORABLE JUDGE:**

  **COMES NOW** Plaintiff, Loise Hicks, filing this Original Complaint complaining of Defendant, TeleTech Service Corporation and in support thereof would show as follows:

**I.**

**JURISDICTION, PARTIES AND VENUE**

  1. This Court has jurisdiction over the causes of action asserted by Plaintiff pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; 28 U.S.C. §§ 1331 and 1343(a)(4), 29 U.S.C. 2615 (a)(1)(2), 42 U.S.C. § 1981a(a)(1), 29 U.S.C. § 631, et. al, and 29 U.S.C. § 201 et. al.

  2. Venue is proper in this district pursuant to 42 U.S.C. § 2000e5(f) and 28 U.S.C. § 1391(b)(1)(2) & (c)(2). Defendant Tele Tech Service Corporation operated a location in the Northern District of Texas. Currently, employees work from home in the district. This establishes minimum contacts with the area encompassing the Northern District of Texas and, all or a substantial part of the unlawful acts set forth below occurred in this district.

  3. Plaintiff, Louise Hicks (hereinafter "Plaintiff"), is an individual who resides in Corsicana, Navarro County, Texas. Plaintiff is a member of a group protected by Title VII, The

Age Discrimination Act, The Family Medical Leave Act, and the Fair Labor Standards Act, and was at all relevant times an employee within the meaning of the applicable statutes.

4. **TeleTech Service Corporation** (hereinafter "Defendant") regularly conducts business in the State of Texas. Defendant was at all relevant times an employer within the meaning of Title VII, The Age Discrimination Act, The Family Medical Leave Act, and the Fair Labor Standards Act.

5. The causes of action complained of herein wholly or partly arose in the Northern District of Texas, Dallas Division.

6. Defendant TeleTech Service Corporation is an employer in accordance with 29 U.S.C. § 2611(4)(A)(i-ii).

7. At the time of the incidents giving rise to this complaint, the plaintiff was an employee in accordance with 29 U.S.C. 2611(2)(A)(i-ii).

## II.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8. Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission (hereinafter "EEOC") on or about May 2, 2019 The charge was amended on or about June 18, 2020, and a related charge was filed on December 17, 2020, after the Right to Sue Letter was issued in Charge Number 450-2019-0345. Plaintiff has filed two EEOC charges that underly this complaint-Charge number 450-2019-0345 and intertwined and related Charge number 450-2021-01489, filed after the Right to Sue letter was issued in Charge Number 450-2019-0345, addressing post Right to Sue Letter related conduct of the Defendant.

In Charge Number 450-2019-0345 and 450-2021-01489, Plaintiff asserted that she was subjected to discriminatory treatment in violation of Title VII of the Civil Rights Act of 1964, as amended, because of retaliation, hostile work environment, age, gender (female), nationality-African American, violations of the Family Medical Leave Act, and violations of the Fair Labor Standards Act.

9. The EEOC issued a Right to Sue Notice in Charge No. 450-2019-0345 authorizing this lawsuit on November 5, 2020. Plaintiff has exhausted her administrative remedies and files this suit within the statutory

limitations period. A copy of such "Right to Sue" letter is provided as exhibit 1.

### III. FACTUAL BACKGROUND

10. Plaintiff began her employment on or about July 20, 2017. It is asserted that the number of the Defendant's employees exceeds 500.

11. The plaintiff was hired as a Team Lead.

12. The plaintiff was directly supervised by TeleTech Service Corporation employees.

13. The plaintiff complained about the actions of TeleTech Service Corporation to various company officials prior to bringing the matter to the EEOC.

14. After a meeting on 12/20/2018, in which concerns over her work environment and treatment were discussed, the Plaintiff filed her 1st formal complaint on 1/18/19 with the Human Capital department of Teletech Corporation based on discriminatory employment practices that led to retaliation and harassment by then supervisor, Mitch Rector. She filed her 2nd formal complaint on 4/22/2019 with Stephen Miller, Mitch Rector's manager and Meghan Prater of Human Capital. She filed with the EEOC on May 2, 2019 because the retaliation, racial discrimination and harassment had worsened.

15. ` On January 16, 2019 -Mitch Rector yelled at her where he could be heard by other employees in a demeaning, unprofessional, degrading, disrespectful manner with a look of anger, hostility, malicious and a violent tone that left me embarrassed and emotionally shaken because I was being bullied and harassed for asking for clarification on a matter where once again the consistent pattern of my authority as a manager was undermined by him and another white manager with the same job position that I have.

16. On January 18, 2019, she filed a formal complaint of discrimination, retaliation and defamation of character by her manager Mitch Rector with the Defendant.

17. On February 18 and March 6, 2019, the Plaintiff was falsely accused by Mitch Rector in the presence of others of calling him a racist.

3

18. On May 20, 2019, the plaintiff sent an email on May 1, 2019 inquiring about having a weekend day off because Mitch Rector had stated prior to our shift bid that he was going to see if each Team Lead would have a weekend day off. All shifts had a weekend day off except my shift, in which the plaintiff had Monday, Tuesday and Wednesday off on a 10 hour/4-day work week. When the plaintiff inquired again in the May 20th meeting, Mitch stated that if the plaintiff wanted a weekend day off, she should have taken the 2:30pm to 11:00pm shift. Because the plaintiff didn't want to work that late and had the right to take the shift, she took the 9:00am to 7:30 pm based on her ranking, the plaintiff felt that Mitch Rector refused the request for me to have a weekend off due to further retaliate against me.

19. It had been stated that each team lead's schedule must be 80% aligned with their consultants. That was not the case with the plaintiff's team which was the most misaligned team and the fact that no team lead had met the reliability requirement, with everyone being in the 80% rather than the target of 95%. I was unfairly targeted and singled out.

20. Since July 2018, the plaintiff had been singled out in manager's meetings regarding not having her "work" completed and manager observation reports. These observations weighed heavily on her shift bidding. The plaintiff continuously asked for these reports in which Rector would not respond and finally after a delay, she started getting them again in January 2019. The January 2019 reports were accurate with the exception of the data pertaining to the two black managers. The black manager's numbers were always incorrect (substantially lower).

21. For weeks, the plaintiff had asked questions and inquired about the inaccuracies of these January 2019 reports which fell on death ears until she filed the formal complaint. At that time when the reports were removed from her manager's hands and escalated, the corrected reports were provided to her which revealed that her numbers had been substantially understated. These reports also revealed that the white managers were given a pass and that it appeared there was foul play from the reports received from September forward as a result of her filing the formal complaint.

22. These corrected reports revealed that the white managers were not held to the same standard of work accountability that the black managers were held to.

4

23.     The plaintiff (along with another black female manger) ware excluded from an interviewing process where only the white females were allowed to participate in whereas the candidate would be coordinating work responsibilities with all managers.

24.     It is alleged that the plaintiff's expertise and experience were vastly superior to all white managers and coaches. It appeared that only white employees were allowed to conduct the interviews, even though she had been a department head in my past career and to her knowledge, she is the only manager with a bachelor's degree.

25.     The plaintiff observed a white male manager become insubordinate to their supervisor when he refused to hear an observation being made by the other black female manager. This white male said he wasn't going to listen to what she had to say, abruptly got up, and proceeded to walk out. Our supervisor spoke softly and kindly asking him to come back.  This white male never looked back and kept walking. To the plaintiff 's knowledge, there were no corrective actions or disciplinary action taken against him.

26.     In contrast, a white female manager had undermined the plaintiff's authority with their supervisor's support and ended up causing adverse actions to one of her subordinates, whereas the plaintiff was advised to work on and report back to him that I was having this situation resolved.

27.     Unbeknownst to the plaintiff , the supervisor had the white manager to take it over and when it was determined that it wasn't fixed as the white manger had reported to him, the white manager stated that the plaintiff should fix her mistake.  The plaintiff wasn't aware that the problem wasn't fixed, however the white manager suggested that she fix the problem (the white manager's)

28.     When the plaintiff went to discuss this matter with their supervisor, she was yelled at in a dehumanizing, disrespectful, unprofessional and degrading manner that could be heard on the production floor by others and not only did she suffer the emotional degradation, but she was also given a dreadful look of deep anger and hostility that was highly embarrassing when it was obvious that she was meant to get out of his office.

29.     In addition, this particular white female manager had been supported by their supervisor in other incidents of undermining the plaintiff 's authority with her subordinates to the

extent of arranging a permanent schedule for a white female to keep her job and their boss advised the plaintiff to check with the white manager who had worked out a schedule for this woman who was in violation of the company's policies and procedures.

30.     Furthermore, this same white manager was also investigating a situation again with their supervisor's support that was involving one of my subordinates unbeknownst to me and having another one of my subordinates write up a memo in an attempt to create a situation to fire a black female employee that was her subordinate.

31.     The plaintiff's subordinate informed her because she didn't feel comfortable writing the memo that this white manger had her to include the plaintiff's name in the memo without her knowledge and she didn't know all the facts of the situation where a white female had called the black female a "bitch" when coming to talk to the plaintiff about the matter, in front of another witness to the incident.

32.     There were other incidents with the same white female where she would undermine the plaintiff's authority with her supervisor's support as if the plaintiff was there but had no authority to do the job she was hired to do. Yet, as an exempt employee, as an executive, had no authority over her subordinates, nor were her suggestions regarding important hiring and firing and other management decisions taken into consideration.

33.     Continuing, the racial and hostile work environment was further underpinned by an environment that allowed the white managers to have their work done by other whites of lesser ranks and keep it undercover so that the black managers would not know, yet they had time to decorate and knew well in advance of the work expectations. The plaintiff was targeted and ridiculed openly in meetings for not getting her "work" done when she didn't know what that "work" was, nor was she trained or provided the resources/tools to perform this "work". The white mangers have never been harshly spoken to or adversely treated in her presence. One of the white managers is known to be obnoxious and unprofessional to the point that employees complained that if they placed them under her management, they would quit. Their supervisor placed these employees under the plaintiff and other managers rather than discipline her. This manager was known to be a problematic employee, yet

she was protected by their supervisor.

34. The plaintiff continued to be targeted, singled out and picked on in the team meanings prior to and after the shift bids concluded in November 2018 because of her team's performance and not getting her "work" done on several occasions, yet she inherited a team of low performers with poor attendance that she had no control over.

35. Race "double standards" prevailed in the plaintiff's employment environment, for example, her manager filed a corrective action on a black manager for allegedly touching a white employee who was allegedly insubordinate to the black manager. Yet, according to information and belief, when a black male employee sent an email about one of the white female managers touching him, who admitted to the plaintiff, she did touch him, nothing was done, and this black male was fired for a lesser offense than the white female who was given a second chance.

36. There are numerous examples of a double standard culture of employment practices and discipline-one for whites and one for blacks.

37. There has been a consistent pattern of exclusion, as it pertains to the plaintiff's job performance. One of her subordinates contacted the plaintiff on March 15, 2019 informing her that she received a letter of termination which the plaintiff had no knowledge of!

38. It is alleged that the plaintiff is the oldest manager at their (then) work location. She has been "sneered at", treated like a "mom", a "nag", and in every conversation and situation at work, her age is subtly a part of every encounter, especially with her supervisors and fellow managers and some subordinates.

39. The plaintiff filed a 3rd complaint that nothing had changed since the departure of Mitch Rector where a black female was put in charge. The favoritism, troubling unfairness and retaliatory behaviors within the service department continued, with Operations Manager, Leticia Woods (black female), now known as Leticia Davis. The plaintiff was asked by Ms. Davis' superior, Stephen Miller to respond with his follow-up questions to her 1/19/20 complaint. The plaintiff responded to Mr. Miller on 3/16/20 where a copy of the response was emailed to the Corporate TTEC office.

40. The complaint centered on the fact that the other black manager and the plaintiff were disrespected by other ethnicities and this behavior was tolerated and condoned by the white manager and now the black manager.

41. On March 16, 2020, the 3rd Formal Complaint filed, emailed to Steven Miller and Alyssia Fotenos with no response where the plaintiff highlighted the continued retaliation and toxic hostile work environment that included the shift bid that took place where the plaintiff had concerns as to the process used to place her on the 2:30pm to 11:00pm shift where others were given preferential treatment by her then Operations Manager, Leticia Woods.

42. In early July 2020, another "shift bid" was implemented by Leticia Woods where only Martyn "Alex" Keith and the plaintiff were shifted; however, Leticia Woods only was going to give me part of Alex's schedule in which she questioned because it did not appear to be a "shift bid" with just movement of the plaintiff and Alex. During this "shift bid", Ms. Woods allowed Alex to keep his star performers but placed my star performer, Michael Richards on Alex's team. When the plaintiff questioned the motive for this, Ms. Woods allowed Michael Richards to be returned to my team in mid-July 2020. It appeared that everything was by design to set the plaintiff up for failure and to create an environment so distasteful and unbearable that she would be forced to quit her job.

43. In a staff meeting around the same time in July 2020, Team Leads were given more concrete information about the impending eHealth Project where some or all Team Leads would be transferred temporarily over to the eHealth Project for the Annual Open Enrollment Period (AEP) that commenced October 7 through December 7, 2020. The plaintiff requested that if a Team Lead (TL) was allowed to stay with Progressive, the plaintiff would like to remain with the Progressive Project. Then the other black TL, Ms. Lola Searcy also stated that she too would like to remain. When it was time to transfer, we were advised by Ms. Woods that only Martyn "Alex" Keith (white male) would remain with the Progressive Project. There was no consideration given to me or Ms. Searcy when we were the only 2 Team Leads who requested to remain with Progressive if all Team Leads were not transitioned over to eHealth and upon information and belief, not all were.

44. On 9/14/2020, selected Team Leads along with their staff were transitioned over to

eHealth for the AEP. However, it appeared that once in the eHealth Project, Jennifer Rollins began the same undermining the plaintiff's authority tactics that she had done when on the Progressive Project. Again, it was Michael Richards that Ms. Rollins appeared to want off the plaintiff's team and targeted to have him transferred back to Progressive, since the plaintiff had chosen him to her coach for Team Louise. It appeared again by design that Ms. Rollins wanted to set the plaintiff up for failure by making sure that the most efficient and proficient consultant on her team would be sent back to Progressive. The fabrication circled around about the plaintiff not being responsive to Michael Richards, thus prompting an intervention by Ms. Rollins was warranted, appeared to be blatant retaliation and hostility toward the plaintiff by Ms. Rollins.

45. This ordeal became so humiliating that the plaintiff decided to email Ms. Rollins (9/29/20) to find out why all the correspondence with Michael Richards without her knowledge as his Team Lead was taking place, when he is relaying all the information to the plaintiff and stating that he was confused as to what was going on and the plaintiff had no clue as to what was going on either, as she was completely blindsided and undermined/humiliated as Michael's Team Lead.

46. When Ms. Rollins responded back to the plaintiff, she caused concern in the plaintiff by Ms. Rollins's behavior and her deception/deception about the plaintiff and her role as Michael's Team Lead. Next, the plaintiff sent an email (9/30/2020) to Ms. Mary Brown, manager who became their supervisor after the departure of Ms. Leticia Woods and her eHealth manager, Allyson Guilmette with detailed information as to Ms. Rollins's behavior of hostility toward the plaintiff and the depiction/deception regarding the plaintiff.

47. Ms. Brown responded back (9/30/2020) in which it appeared by her response that she did not even read the email and totally dismissed the plaintiff in favor of Jennifer Rollins (white female) where it was noticeably clear in her email chronology that Ms. Rollins' email to the plaintiff was not credible. Again, the plaintiff was highly insulted and humiliated that she further emailed (10/1/2020) Mary Brown's supervisor, Steven Miller, and HC representative, Alyssia Fotenos informing them that the retaliation and undermining of her authority continues based on the fact that she had filed the EEOC complaint in May 2019 in hopes that they would address this most degrading,

9


dehumanizing behavior.


48.     On 10/1/2020, the plaintiff received a response from Alyssia Fotenos advising her that Ginger Woodward, Compliance and Fraud Investigation Manager would be reaching out to her to get more details of what the plaintiff had shared.

49.     On 10/1/2020, within a couple of hours after I received the email from Ms. Fotenos, the plaintiff received an email from Ms. Ginger Woodward advising her that she would like to set up a time to talk with the plaintiff

50.     On 10/6/2020, the plaintiff received an email from Ms. Julie Bisbee, Director of Ethics, and Integrity Management that she had received my attorney's information and had contacted him about speaking with me regarding the issues that were raised. She advised the plaintiff that as soon as she hears back from my attorney, she could arrange a meeting to speak with us.

51.     On 10/7/2020, I received a text message from Jennifer Rollins that made matters worse regarding the issues and the damage it was causing me,

52.     In fact, by this time, the plaintiff was totally exhausted and numb to all of this that her Fibromyalgia had worsened with sleepless nights and quite excruciating pain throughout her body. By the weekend, she began to have chest and arm pain that became so severe that she was considering going to the emergency room but became fearful due to the COVID-19 pandemic and did home remedies and bed rest to see if the pain would subside. It did subside and as the plaintiff went to work Monday morning, October 12, 2020, the chest, and arm pain started up again that prompted her to call my doctor and make an appointment.

53.     On 10/13/20, the plaintiff went to see her doctor and was taken off work on an approved FMLA leave, scheduled to return on Monday, 11/2/2020. The plaintiff advised her doctor that she was not only in much physical pain, but her emotional state was such that she had sought counseling through TTEC's Employee Assistance Program and was seeking to get an appointment ASAP with a Counselor because the stress and anxiety had also taken its toll on her.

54.     The plaintiff was scheduled to meet electronically with Ms. Bisbee and her attorney on Friday, 11/20/2020 after her initial counseling session that was scheduled for 11/10/2020.

55. On 11/2/2020, The plaintiff returned to Progressive after her approved FMLA medical leave. She followed all reporting procedures of TTEC about her return date by notifying her immediate supervisor, Allyson Gulimette, and her eHealth trainer, Todzae Carter on 10/13/2020. She also informed by her eHealth manager, Allyson Guilmette about a fingerprinting appointment that was scheduled for 10/14/2020 and was not sure if the plaintiff should proceed with the appointment. Allyson responded to the plaintiff in their Teams chat and said she would have to follow-up on the fingerprinting. However, no one contacted the plaintiff about her return to work on 11/2/2020 status or the fingerprinting appointment during her entire FMLA approved medical leave to let her know next steps upon returning.

56. On Friday, 10/30/20, the plaintiff reached out to her eHealth trainer Todzae Carter. Todzae advised her that the eHealth training class was over, and she did not know where the plaintiff was to report. So, the plaintiff just reported to work at her usual time, 7 a.m. to await management to advise her of her reporting protocol or if not, she was going to reach out to Allyson Guilmette to find out where she was to report.

57. Within about an hour after the plaintiff was back to work on 11/2/2020, Allyson contacted her and advised her to report to Jessie Perry who would be her new manager. The plaintiff reached out to Jessie Perry to advise her of what she was told by Allyson and let her know that she was reviewing all the emails that had accumulated and about the reimaging of her computer for eHealth and that the plaintiff was unable to access any applications on TTEC, except her emails, Teams and the Time Management System (Kronos).

58. When transitioning to the eHealth project, the plaintiff's payroll status was changed from salaried to hourly, so she was advised to continue to clock IN/OUT until she was returned to her salaried position with Progressive. At this time, she had no access to the Progressive Client applications on her computer. Jessie advised her that Allyson had reached out to Talent Acquisition (TA) to have them work on getting the plaintiff's computer reimagined and returning her to full Progressive functionality. It was clear to the plaintiff that no preparation was made for her to return from approved FMLA medical leave to her former position as a salaried Team Lead with Progressive

11

and she had no idea that the next month would be even more stressful. Jessie Perry advised her that she did not know that the plaintiff was returning until the morning of her return, 11/2/2020.

59. On 11/3/2020, the plaintiff was provided with a new team and over the next 3 weeks she was on and off the phone with the At Home Service Desk (ASD) mostly and a few times with the Progressive Help Desk trying to get her computer reimaged correctly so that she could function at work. By the date of her meeting with Ms. Julie Bisbee and her attorney, she had spent several hours, many over 40 per week working with ASD and Progressive trying to get her computer working and having a team of consultants that she could only communicate with via her cell phone since she had no access to Progressive and limited access to TTEC, with only email, Teams and Kronos functionality.

60. Despite the challenges, the plaintiff managed to get what data she could from other TLs to put together some working documents so when she did get an operational computer system, she would be able to have something to coach her team with.

61. However, the situation became worse as the month went on. With her new team, there was also a schedule change for the plaintiff as well where she was no longer able to work my 9:00 am to 5:30 pm with Saturdays and Sundays off that she had just gotten in July 2020.

62. The plaintiff asked Jessie Perry if she could resume her schedule when the other TLs return from eHealth on December 8, 2020 because she had never had weekends off, which was one of her concerns in her 3rd formal complaint due to preferential treatment given by Ms. Leticia Woods.

63. On 11/20/20 when the plaintiff was supposed to have the meeting with her attorney and Ms. Bisbee, she was totally devastated because ASD had lost all of her desktop applications including the one that she had worked tirelessly to set up with the limited resources that she had to work with, so that she could expedite her work with her new team after the reimaging process. The plaintiff was totally exhausted and in tears and in no shape to have the meeting, even though she and her attorney proceeded with their meeting with Ms. Bisbee and explained to her what had happened with no recovery of her data. Ms. Bisbee said she would look into the matter in which she did respond and said that IT would see if they could recover her files. Ms. Bisbee rescheduled the

meeting to the following Monday, 11/23/20.

64. At the meeting, the plaintiff conveyed the email chain and Jen's text message regarding the issues she presented.

65. The plaintiff views this matter as a stressful ordeal as no one felt the decency to prepare for her returning from FMLA approved medical leave as if she did not exist.

66. The plaintiff received a text message on 12//5/2000 from Michael Richards, addressing again a communication that the plaintiff was not a part of, but affected her and my team.

67. It is alleged that the effect of the practices complained of in the succeeding paragraphs, in accordance with the statutory basis, stated herein, has been to deprive the Plaintiff of equal employment opportunities and to otherwise adversely affect her status as an employee because of her gender (female), race, nationality-African American, violations of the family Medical Leave Act, and violations of the Fair Labor Standards Act.

## IV.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*Violation of Title VII - Disparate Treatment*

68. Plaintiff repeats and realleges the allegations contained in the foregoing, paragraphs 1 through 67.

69. Defendant, TeleTech Service Corporation and TeleTech Service Corporation engaged in discriminatory behavior towards the plaintiff, based upon her race, gender, age, and national origin by creating a hostile work environment. The plaintiff was subjected to differential treatment by TeleTech Service Corporation employees.

70. In addition to the work environment, the Defendant's intrusion and harassment into crossed over and reached the non-employment life of the plaintiff,

71. The Defendant's discriminatory practices described above have denied the Plaintiff promotional opportunities if any, compensation, and a :very real" non-constructive / constructive

13

discharge. The plaintiff was in a non win situation, (1) if she complained about the Defendant's conduct, she would be verbally assaulted, threatened with and dealt with what was tantamount to termination and harassed some more, (2) if she risked it and gathered her courage to complain to up the chain of command and others in Human Resources, she would (also) not get any help.

The plaintiff was treated like a bouncing ball. This conduct has resulted in emotional distress and other harm for which entitles the plaintiff to compensation.

72. The Defendants have undertaken these discriminatory practices willfully or with reckless disregard for the rights of Plaintiff. Such rights are protected under 42 U.S.C. § 1981(a)(a)(1).

73. These employment practices violated § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. The actions of the Defendant were conducted through their agents. The respondent superior principles construed under the herein aforementioned statute(s) are hereby invoked for the liability of TeleTech Service Corporation for its agents who engaged in the prohibited discriminatory behavior.

## SECOND and THIRD CLAIM FOR RELIEF

*Violation of Title VII - Disparate Impact and 1981*

74. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs 1 through 73.

75. Defendant engaged in a prohibited activity when it applied its work-related policies against the Plaintiff in a discriminatory manner. In every instance where the Plaintiff invoked the policies of the Defendant she was unfairly treated by her supervisors in its application to her protected class.

76. The Defendant's discriminatory practices described above have denied the Plaintiff promotional opportunities, compensation, and continued employment to which she was otherwise entitled. This conduct has resulted in emotional distress and other harm for which entitles her to compensation.

77. The Defendants have undertaken these discriminatory practices willfully or with reckless disregard for the rights of Plaintiff. Such rights are protected under 42 U.S.C. § 1981(a)(a)(1).

78. These employment practices violated § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. The actions of the Defendant were conducted through their agents. The respondent superior principles construed under the herein aforementioned statute(s) are hereby invoked for the liability of TeleTech Service Corporation for its agents who engaged in the prohibited discriminatory behavior.

## FOURTH CLAIM FOR RELIEF

*Violation of Title VII – Retaliation*

79. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs 1 through 78.

80. Defendants took disciplinary action against Plaintiff as a result of the Plaintiff making complaints with regard to her hostile work environment allegations contained in the previous paragraphs 1-78 incorporated herein by reference. This disciplinary action includes write-ups, verbal warnings, and threatened disciplinary action.

81. After Plaintiff reported her concerns about the harassment, and the hostile work environment, based upon her protected status of race, gender, age, and national origin, the Plaintiff was subjected to further retaliation by the Defendants.

## FIFTH CLAIM FOR RELIEF

*Violation of Family Medical Leave Act and Retaliation*

82. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs 1 through 81. The Defendants are engaged in the customer industry in the State of Texas. Defendant has at least 500 or more employees. The Defendants engage in interstate commerce in accordance with the provisions established under 29 U.S.C. § 2611(1).

Case 3:21-cv-00212-E   Document 1   Filed 01/31/21   Page 16 of 20   PageID 16

81. TeleTech Service Corporation meet the definition of employer under the Family Medical Leave Act (FMLA) as it relates to the plaintiff's claims of violation(s) of the FMLA in that an employer under FMLA is any person engaged in commerce or in any industry or activity affecting commerce, who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year. That year will be 2019 as it relates to the plaintiff's claim. The plaintiff claims that this requirement is met. The defendant(s) operated in the State of Texas and maintained the requisite number of employees for the requisite number of workweeks, during the time that the plaintiff was employed with the defendant.

82. The plaintiff alleges that she was employed by the employer (TeleTech Service Corporation ) for at least 12 months, and that she was employed for at least 1,250 hours of service during the 12-month period immediately preceding the commencement of the leave, and that she was employed at a worksite where 50 or more employees are employed by the employer within 75 miles of that worksite.

83. The plaintiff began her employment with the defendants in 20177. The plaintiff believed she needed some time off from work under the circumstances which may qualify her for the Family Medical Leave Act.

84. The plaintiff utilized her FMLA time to meet her needs regarding the working environment she worked in.

85. Specifically, in violation of 29 U.S.C. § 2615 (a)(1) (2), (b)(2) and 29 U.S.C. § 2614 (a)(1)(A)(B) and (2), the Defendant engaged in conduct that demonstrated their intent to harm the plaintiff as it relates to her work conditions.

86. Furthermore, after the plaintiff's FMLA leave was approved, and when she returned the Defendant engaged in retaliatory actions in violation of the plaintiff's Family Medical Leave Act rights:

16

87. In violation of the FMLA as alleged herein, the Defendant(s) made efforts to effectively rid the company of the plaintiff's presence (employment) by manipulating the job for which she was assigned. Although the accomplishment of this scheme was executed all the more discreetly and timed to take place "shortly" after she returned from her protected leave, it is plainly obvious that the Defendant's planned attack or execution of this attack would result in the plaintiff never being able to return to her previous position or want to.

88. The defendant's plan and execution of their either "take it or leave it" approach was in violation of the prohibited provisions of the FMLA as asserted herein above.

89. The acts complained about above and herein were done with Defendant tacit approval and were done in contravention of the plaintiff's protected status under the Family Medical Leave Act.

## SIXEH CLAIM FOR RELIEF

*Violation of Fair Labor Standards Act and Retaliation*

90. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs 1 through 89. The Defendants are engaged in the customer industry in the State of Texas. The Defendant engages in interstate commerce in accordance with the provisions established under The Fair Labor Standards Act of 1938, *U.S.C. 209 § 201 (203)  to 219* et al.

91. TeleTech Service Corporation meet the definition of employer under the Fair Labor Standards Act (FLSA) as it relates to the plaintiff's claims of violation(s) of the FLSA in that an employer under FLSA is engaged in interstate commerce or in any industry or activity affecting commerce, The plaintiff claims that this requirement is met.

92. The plaintiff alleges that she was employed by the employer (TeleTech Service Corporation ) and that she was employed in a salaried position at times.

93. The plaintiff began her employment with the defendant in 20177. The plaintiff asserts that she was treated as  an hourly employee when she should have been treated as a salaried employee, off and on

17

throughput her employment.

94. The plaintiff is due wages when she was classified as an exempt employee, but this exemption was not meet, respected or utilized and she was retaliated for complaining about such behavior.

95. The plaintiff is, upon information and belief, possibly due overtime for this rampant misclassification.

96. Furthermore, its is asserted that the defendant; s conduct was willful.

97. In violation of the FLSA as alleged herein, the Defendant made efforts to appear in compliance with the salary exemptions, but in substance they treated the exemption as a smoke screen and instead "did as they pleased".

98. The acts complained about above and herein were done with Defendant tacit approval and were done in contravention of the plaintiff's protected status under the Fair Labor Standards Act.

### SEVENTH CLAIM FOR RELIEF

*Violation of Age Discrimination*

99. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs 1 through 98. The Defendant violated the provisions established under 29 *U.S.C. § 62 to 634, et al.*

100. TeleTech Service Corporation employees treated the plaintiff as older, used her age as a criterion in work related matters and disrespected her from an age standpoint in the work environment.

101. The acts complained about above and herein were done with Defendant tacit's approval and were done in contravention of the plaintiff's protected status under the Age Discrimination statute.

### V.

### JURY DEMAND

102. Plaintiff requests that this action be heard before a jury.

18

## VI.
## DAMAGES

103. Defendant's conduct constitutes violations of statutory law. That unlawful conduct seriously affected Plaintiff in her occupation, trade and business. Because of Defendant's unlawful conduct, Plaintiff has suffered, suffers, and will suffer in the future humiliation, mental anxiety, stress, and other damages. Accordingly, Plaintiff seeks all general, special, incidental and consequential damages available, all in an amount to be proved at trial.

104. Because of Defendant's unlawful conduct, it has been necessary for Plaintiff to retain the undersigned attorney to represent her. Plaintiff has agreed to pay the attorney reasonable attorney's fees for the preparation and trial of the causes, and further for any appeal thereof should same become necessary.

105. Additionally, Plaintiff has suffered out-of-pocket expenses, which include litigation costs, (including experts) and other expenses to preserve her ability to earn a living. Accordingly, Plaintiff seeks all general, special, incidental and consequential damages as shall be proven at trial.

106. Further, Plaintiff seeks pre-judgment interest at a rate commensurate with the actual rate of interest in the marketplace or, alternatively, the statutory rate of interest because of the delay in receiving the damages and to avoid unjust enrichment to Defendant. Plaintiff also seeks post-judgment interest at the maximum rate allowed by law in the event that Defendant does not promptly tender damages assessed against them and to avoid unjustly enriching Defendant.

107. Further, Plaintiff seeks any and all punitive or exemplary damages that are available within the context of this suit, based upon any statutory basis, for the willful and recklessly disregard for the plaintiff's civil rights.

## VII. PRAYER

WHEREFORE, premises considered, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff has judgment against Defendant. on all the claims listed herein together with:

a. Permanent injunction enjoining Defendant, its agents, successors, employees, and those acting in consort with Defendant, from continuing to violate Plaintiff's civil rights.

b. All damages to which Plaintiff may be entitled pursuant to this Complaint, or any amendment(s) thereto, including but not limited to back pay, reinstatement, front pay, punitive or exemplary damages, statutory relief at law, and equity;

c. Compensatory damages for pain and mental suffering;

d. Reasonable attorney's fees, with conditional awards in the event of appeal;

e. Pre-judgment interest at the highest rate permitted by law;

f. Post-judgment interest from the judgment until paid at the highest rate permitted by law;

g. Costs of court; and

h. Such other and further relief, at law or in equity, to which Plaintiff may be entitled, whether by this Original Complaint or by any amendment hereto.

Respectfully submitted,
Law Office of Derrick D. King
2050 Ave H
Rosenberg, Texas 77571
281-762-7158 Office
713-481-0814 Fax

By:_____
Derrick D. King
State Bar No. 24036911
Northern District Bar No.
Attorney for Plaintiff
Louise Hicks